ELLIS, Judge:
Plaintiff Guess Orgeron was injured while shopping in Ledet’s Giant Supermarket when a Coca-Cola bottle exploded, cutting his wrist. He filed this suit for damages arising therefrom against Louisiana Coca-Cola Bottling Company, Ltd., Owens-Illinois, Inc., Chattanooga Glass Company and Sterling Ledet, doing business as Le-det’s Giant Supermarket. Plaintiff voluntarily dismissed Owens-Illinois and Chattanooga Glass as defendants, without prejudice, on April 11, 1980. On the morning of the trial herein, December 8, 1980, following a compromise settlement, the suit was dismissed, with prejudice, as to Ledet, with all rights reserved against Coca-Cola. The suit was tried as to Louisiana Coca-Cola Bottling Company, Ltd., only.
No issue was made as to liability by Coca-Cola, and the suit was tried, for the most part, as to quantum only. After trial, judgment was rendered in favor of plaintiff for $117,251.13, consisting of $70,000.00 for pain, suffering, disability and disfigurement; $7,822.70 for past and future medical expenses; and $39,428.43 for economic loss. From this judgment Coca-Cola has appealed, complaining that the award is grossly excessive.
The record shows that on August 4, 1978, plaintiff received a laceration on the back of his left wrist, when a Coca-Cola bottle on a supermarket shelf exploded. He had the wound sutured in the emergency room of a hospital, but did not seek other medical attention until August 9, 1978, when he consulted Dr. Robert M. Boulet, a general practitioner.
Dr. Boulet found plaintiff’s hand to be red and swollen, with plaintiff complaining of pain and numbness of the fingers. The doctor suspected that the numbness might have resulted from some of the sensory nerves having been severed. The stitches were removed because of suspected infection in the wound. Dr. Boulet treated plaintiff with an antibiotic enzyme, B-eom-plex vitamins, vitamins by injection and Butazolidin. During the course of the treatment, plaintiff complained of continued pain and numbness. His hand remained swollen, with little mobility of the fingers.
Dr. Boulet last saw plaintiff on August 23, 1978, at which time his discharge note showed that the wound had healed, but that there was still numbness of the index finger and little finger, some difficulty in moving the index finger, marked swelling, and a mild tremor of the hand. He expected all of these conditions to improve, and recommended an orthopedic or neurological evaluation.
Plaintiff then consulted Dr. Pete H. Rhymes, an orthopedist, on November 2, 1978. Plaintiff complained of pain in the left little finger, and generally over his hand and wrist, and that he was unable to use his hand. Dr. Rhymes’s examination revealed good function of the hand, in that plaintiff could open and close his fingers. There was some weakness of grip, and in dorsiflexion (bending backward) of the wrist, but X-rays proved to be normal. Dr. Rhymes noted no swelling or objective signs of pain, but plaintiff told him that he could not use the hand because of the pain it caused, and that there was intermittent swelling.
An arthrogram was taken which indicated a leak or tear in the capsule containing the structure of the wrist. The wrist was splinted, in the hope that the tear would repair itself. Because of continued complaints of pain, a nerve conduction study and electromyographic (EMG) studies were conducted, the findings of which were reported normal. Eventually, on January 16, 1979, surgical repair of the tear was performed, at which time no nerve damage was observed.
After the surgery, plaintiff’s arm was placed in a cast until the middle of February, 1979, at which time he began super *541 vised therapy, in the form of paraffin baths and hand and finger exercises. About two months after surgery, plaintiff developed some pain and numbness on the radial border of the hand, probably due to scarring of the nerve structures in the area of the surgery. Cortisone was injected throughout the entire arm in an effort to decrease the scarring and relieve pressure on the nerve roots.
By May 17, 1979, there was some tenderness at the site of the injury, good dorsi-flexion and poor palmar flexion (downward bending of the wrist). Plaintiff had some numbness in the region of the thumb and index finger, described as a tingling sensation when he rubbed his fingers together. At that time, Dr. Rhymes felt that plaintiff had a 15 per cent impairment of the hand, and did not believe that plaintiff could drive a truck.
In February, 1980, plaintiff still complained of the same problems, plus a burning sensation in his little finger, which Dr. Rhymes could not relate to the injury. X-rays were normal and plaintiff had a grip strength of 70 pounds in his right hand and 30 in his left. The doctor stated that 60 to 65 pounds would be normal. A nerve conduction study showed some decrease in the function of the radial nerve.
In March, 1980, additional EMG studies were done, and Dr. Rhymes concluded that there was radial nerve damage as a result of the injury. He felt that there was nothing else that could be done about it, and that plaintiff’s condition was permanent. He discharged plaintiff with a 20 per cent disability of the left hand, which, he said, was really larger because the injury prevented plaintiff from doing his job of driving a truck.
The physical therapist who supervised plaintiff’s therapy during the period of his treatment by Dr. Rhymes testified that plaintiff’s hand had improved some, but that it was nowhere near normal.
However, Dr. Rhymes further testified that there was no structural damage to plaintiff’s wrist other than to the radial nerve and the wrist capsule; that the radial nerve, at that level, performed a sensory function only and would not affect the use of the wrist; that the loss of grip strength probably resulted from not using the hand because of the pain; and that he would expect the grip strength to improve with exercise. He further stated that it would not be unusual for someone of plaintiff’s age and size not to recover despite the use of therapy.
Plaintiff then saw Dr. Christopher E. Ce-nac, an orthopedist, on May 19, 1980. Dr. Cenac found diminished grip strength, and diminished sensation in the radial nerve .and in the left hand. His studies revealed den-ervation in the radial muscles on the left side, essentially resulting from a disruption of the superficial branch of the radial nerve.
Dr. Cenac performed a surgical exploration of the wrist capsule, during which he discovered fibrous tissue buildup in the sy-novia, or joint lining, and that the radial nerve was severed and could not be repaired. Some scar tissue was removed, and the ends of the radial nerve were buried.
As a result, plaintiff still has diminished sensation in the back of his hand in the area of the thumb and forefinger, but his range of motion has improved because of the removal of scar tissue. Plaintiff’s grip strength was up to 84 pounds at the time of trial, December 8,1980, and it was expected to continue to improve for another six to twelve months. There was still some intermittent swelling and discomfort, and plaintiff had been instructed to use his left hand to the best of his ability.
Dr. Cenac assigned a disability of 25 to 35 per cent to the wrist and hand as a whole; and he placed restrictions on heavy lifting, repetitive motion and movement with weights greater than 25 to 50 pounds. He was of the opinion that plaintiff should be able to drive trucks weighing up to one ton, and that his chances of returning to work were very good. He was not sure if plaintiff would be able to drive a large tractor-trailer rig, but thought that he might be able to do so within from six to 12 months *542 after the trial, when the healing was expected to be complete.
Mr. Orgeron testified that his hand and wrist have hurt badly ever since the accident. He stated that he tried to do the physical therapy prescribed by Dr. Rhymes, but was unable to do many of the exercises because of the pain. He testified that during the time he was treated by Drs. Boulet and Rhymes, the pain not only did not go away, but got worse. After the operation by Dr. Cenac there was no improvement. He said that his hand is numb and hurts like a toothache all the time. Plaintiff testified that he has had to give up hunting, fishing and trawling; that he can no longer fix things or do chores around the house; that he needs help to cut up meat and to get dressed; that he must sleep alone and that he has difficulty with his sexual relations. He constantly drops glasses and cups that he tries to hold in his left hand.
Plaintiff is a house mover by trade, and is in partnership with his son. Before the accident, plaintiff testified he had driven the large trucks used in house moving, and had been able to handle the heavy jacks and timbers used in connection therewith. He can no longer do these things, even though his trucks are equipped with power steering.
We find that the foregoing testimony leads to a reasonable conclusion that plaintiff is disabled to perform the physical part of his job. He is still able to act as an estimator, business-getter and supervisor. We are further of the opinion that plaintiff does indeed suffer pain and will probably continue to do so. His testimony as to the pain is unrebutted in the record. Under the circumstances, considering the past and future pain, the operations, the extensive treatment and therapy, and the disability, which is most likely permanent, we find no abuse on the part of the trial judge in making an award of $70,000.00 as general damages.
Plaintiff’s claim for economic loss is based on the assertion that it was necessary to hire two men to replace him in doing the house moving work after he was injured, one to drive the truck and another to act as foreman. The record, however, shows that in both 1978, when the accident occurred, and 1979, when plaintiff was disabled, there were never more than two men employed at the same time, and that, from the time plaintiff was hurt until the end of 1978, there was only one employee. There was also only one employee from February 22, 1980 through July 3, 1980. For eight months prior to plaintiff’s injury in 1978, there had been two employees.
The expert economic testimony presented by plaintiff is based on the assumption that plaintiff had, in fact, been replaced by two men. This assumption is not supported by the record. The record does reveal, however, that during 1978 and 1979, the gross profit in plaintiff’s business increased 38 per cent, and the net profit increased 93 per cent while the payroll increased only 26 per cent.
The record further shows that plaintiff not only lost no income after his injury, but that his income increased. Under the foregoing circumstances, we find that plaintiff has failed to prove economic loss. The alleged necessity to hire two extra men might just as well have resulted from increased business as from plaintiff’s injury, and we find that the record does not reflect that extra workers were hired in the first place. No award for economic loss is justified.
We further note that it is likely that Mr. Orgeron would not have a cause of action for business losses suffered by his partnership, which is, of course, a separate legal entity.
No complaint is made as to the award for medical expenses.
Finally, Coca-Cola claims that the award should be reduced by 75% because plaintiff originally alleged that there were three other tortfeasors. As we said in Raley v. Carter, 401 So.2d 1006, 1008 (La.App. 1st Cir. 1981):
“It is settled law that, when there are four joint tortfeasors, and three of them are released by the plaintiff, plaintiff can only claim one fourth of the total award *543 made in a suit against the remaining tortfeasor. Article 2100, Civil Code; Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3rd Cir. 1964). The negligence of those parties released from the suit may remain an issue in the trial, since the remaining tortfeasor is entitled to a reduction of the award only if the parties released are proved to be joint tortfeasors. If they are found not to be liable, the remaining tortfeasor is not entitled to a reduction. Harvey v. Travelers Insurance Company, supra. Wall v. American Emp. Ins. Co., 386 So.2d 79 (La.1980).
Neither party offered any evidence as to the negligence of the parties released. Coca-Cola claims that the burden of proof was on plaintiff to show the non-negligence of the other defendants if he is to avoid the reduction in the award. In this case, Coca-Cola’s position is not well taken. The circumstances of the case are such that plaintiff was entitled to the benefit of the doctrine of res ipsa loquitur, and Coca-Cola therefore bore the burden of exculpating itself from responsibility. This would include proving joint liability of the other defendants. Since Coca-Cola failed to make such proof, it is not entitled to a reduction of the award.
The judgment appealed from is therefore amended so as to reduce the amount thereof to $77,822.70, and as amended, it is affirmed. Costs of the appeal shall be equally shared by the parties hereto.
AMENDED AND AFFIRMED.